Good morning, everyone. We have six arguments on today's calendar. We'll begin with appeal number 22-1876, Mohamed Emad v. Dodge County and others. Ms. Palmer, good morning. Good morning, Your Honors, and may it please the Court. Megan Palmer for Plaintiff Appellant Mohamed Emad. Mr. Emad is a devout Muslim who has not missed a day of prayer since he was seven. That is, until he was civilly detained by the Dodge County Jail for 14 months. Defendants interfered with his prayer in two ways. First, they prohibited him from praying outside of his cell, forcing him to pray inches from a toilet, which violates central tenets of his faith. Second, they forbade him from praying with even just one other Muslim detainee, which is an essential component of the obligatory Friday prayer. Defendants had a different set of rules for Christian detainees. Christians were allowed to pray outside their cells in the day room, and they were allowed to gather on a regular basis with other Christian detainees for group prayer and group Bible study. Which of the defendants that were sued permitted that? We sued Defendant Schmidt and Bruger on a theory of supervisory liability, and so they were not directly involved with enforcing the restrictions against Mr. Emad, but they are personally liable, in a similar vein to this court's decision in Danville, Cook County, because they approved and were aware of and turned a blind eye to the discriminatory enforcement of the group activity ban. What is your best evidence that Defendants Bruger and Schmidt were aware of the disparate treatment of Christians who were doing Bible studies as a group versus the fact that Muslims were prohibited from meeting together? Beginning with Defendant Bruger, Defendant Bruger closely supervises what happens at the jail. It's his job to know what's going on there, and it's a small facility. The record shows that Bible study was regular, frequent, recurring, and conspicuous. Isn't that too much of an inference to draw? I mean, in that situation, isn't that, aren't you, what you're really asking for is respondeat superior liability? That you're drawing these inferences that because he was in charge of the jail, he must have known what was going on because there were only 300 inmates in the jail? I don't think so, Your Honor, and the reason is that respondeat superior liability would mean that we would be attempting to hold them liable for anything that happened in the course of employment, so an isolated instance. This was not an isolated instance. This was a systemic regular practice that was happening on a regular basis, and I do think that it's fair to draw the inference that he would have been aware of that. Based on what evidence? Based on the frequency of the Bible study, which from the detainee affidavits and Mr. Ahmad's testimony, we know happened on a near daily basis for 30 to 45 minutes and involved moving chairs, standing in circles. It was a very conspicuous practice, and based on Defendant Bruegger's testimony, that he spends time in the living areas of the jail. He walks through the living areas, and he gets daily updates from his correction staff about what's going on in the jail, and this is the sort of thing that he testified would be brought to his attention in those meetings, issues that were happening with detainees. Ms. Palmer, we know for sure, do we not, that Defendant Bruegger was aware that there was no group prayer permitted for Muslim inmates. We know that for certainty because of the response to the inmate grievance that was filed in April of 2019. That's true, yes, Your Honor. We also know that Matt Marvin reports to Bruegger, correct? That's correct, yes. And Matt Marvin unquestionably had quite a bit of knowledge of this. That's true. Matt Marvin testified that Christians can pray together before a meal and read the Bible together in the day room. Okay, so the question I have about Bruegger is, how about on the personal prayer? What's the record show with as much specificity as you can articulate about Bruegger's awareness of personal prayer limitations? Set aside group prayer. Yes, so Defendant Bruegger testified that it was his understanding of the policy that it prohibited all personal worship. But a reasonable jury could easily discredit that testimony for a similar reason, which is that many corrections officers and Defendant Schmidt all testified to a uniform understanding of this policy, which is that it prohibited prayer with a mat and it permitted prayer at a table. So again, this is a systemic practice, a systemic understanding of the policy. And from that, a jury could infer that Defendant Bruegger was aware of the way that it actually operated in practice. Okay, I thought Bruegger testified in his deposition that personal prayer can be done in a cell. That's correct, yes. But it's not clear to me that he was aware of at least your client's particular concern with praying in a cell. In other words, that there was an issue with Muslim inmates praying in cells. Okay, so your question is, was Bruegger aware that praying next to a toilet was a problem? Right, so in other words, your client's challenging the prison's allowance of inmates to pray in their cell. The prison disallowed praying in cells categorically. That would be a major problem. I think everyone would agree with that that way. But you need to show, don't you, to establish liability against Bruegger on the personal prayer policy that he had awareness that there was some kind of limitation with the cells that presented a problem for this particular plaintiff or other Muslim inmates. What's that evidence? I don't think that we need that evidence, Your Honor, and I'd point to Daniel v. Cook County. So in that case, this court held that the sheriff could be personally liable for an inadequate medical care claim, even though he had no specific knowledge about Mr. Daniel's medical problem. He didn't know that casts need to come in. Fair enough. So how about Bruegger with any Muslim inmate? So I do think there is evidence in the record that these complaints could have reached Bruegger, and the reason is that Mr. Ahmad made verbal requests to pray outside of his cell to five or six different officers. And again, those were the kinds of complaints that would have been, because they were repeated and numerous, they would have been reported to Defendant Bruegger in the daily meetings that he had with his staff. I think that's a reasonable inference for a jury to draw, and that is sufficient at this stage of the litigation. But again, I don't think, what Defendant Bruegger did know was that he had a policy that made it substantially more difficult for members of a minority religion to pray, and that is sufficient. Because he knew that the policy was discriminatory. Talking about group prayer now? I'm still talking about individual prayer. Okay. He knew he had a policy that made it substantially more difficult for members of a minority faith to pray, and that is sufficient under Daniel to find him personally liable. Okay. Let me ask you, I appreciate Judge Kirsch's raising this question about the knowledge of individual defendants. To my eye, in preparing for this morning, there seems to be no contest. In other words, this isn't you, it's more the defendants, but they're not contesting the personal involvement of three of the defendants that are named, Matt Martin, Chris Myers, and Scott Buckner. Is that your understanding as well? That is my understanding as well. Okay. So the contest, if there is one, or the dispute between the parties about whether there's adequate involvement or knowledge comes down to three defendants. Correct. Schmidt, Bruger, and then a correctional officer and a program specialist, Jeffrey Schlegel. Correct. Correct? That's where the dispute is in your view? Yes. And then for the three defendants that are disputed, would you agree we have to analyze it in terms of the personal prayer and group prayer? You have to analyze it separately? Yes. Okay. Although I would just point out that the individual prayer claim is solely against defendants Bruger and Schmidt. We do not sue defendant Schlegel with respect to the individual prayer. Oh, did you sue Marvin, Myers, and Buckner? No. Okay. Thank you for that. Yes. So the individual prayer is what you're calling it? Yes. Okay. Individual prayer, the two defendants are only Schmidt and Bruger? Correct. Okay. Thank you. And I would just like to make one more point. Can I ask you a question regarding the group prayer issue? Yes. The group prayer issue, what is the evidence that Marvin, Myers, Schlegel, or Butler facilitated, condoned, or approved the violent of conduct that you're suggesting here, which is I think you're suggesting is allowing the Christian prayer but not allowing the Muslim group prayer, unsupervised? That is the claim as to Bruger and Schmidt. And as we just discussed, there is evidence that Marvin was aware also of the discrimination. But for the other three, the violent of conduct was their failure to respond to the requests for Juma, sustained requests for Juma, both Mr. Mott's and others. But don't they have to be aware of the Christian prayer? Because there's the failure to respond. I mean, they looked for the mom, right, and they couldn't find one that would volunteer, so they said you can't do it. And clearly, there's a legitimate penological interest in this. You can't allow gangs to form in the prison, right, with unsupervised prayer and things like that. There are cases, there's a long history of cases that say that. But with the other defendants, don't you have to have more evidence that they were aware of it and that they condoned the Christian prayer while prohibiting the Muslim prayer? I don't think so, Your Honor, and I'll explain why. So first of all, I do want to point out that viewing the record in the light most favorable to Mr. Ahmad, the last time defendants looked for an imam was six years before Mr. Ahmad arrived at the jail. And there are nine written requests in the record alone for Juma to which defendants took zero action, including not just looking for an imam, but also exploring any of the alternatives that Mr. Ahmad was proposing for other ways to offer Juma. But then also under the free exercise clause, defendants have to make reasonable efforts to provide an opportunity for religious practice. And they must provide, this is from Cruz Viveto, they must provide a reasonable opportunity of exercising their faith comparable to the opportunity afforded adherence of other faiths. And they were all aware that there had been no Muslim programming in more than 20 years, with a single isolated exception towards the beginning of that period. And so they were all aware that they were violating that. But is there evidence that they were aware that there was unsupervised Christian prayer occurring in the prison? As to Schlegel, Buckner, and Myers, no. But that is not necessary for liability. I see that I've run into my rebuttal time. Yeah, we're going to give you, we may need to spend a little more time here. So we'll give you your three minutes on rebuttal. I have a question. How do you read, you read Cruz as an equal protection holding? I read it as a free exercise holding. Equal protection as well. The references of the 14th Amendment, you think they're all about incorporation of the first? I think that it's been treated both ways in the case law. That is how I ultimately read it after spending a lot of time with the case, but I'm not entirely sure. So let me ask you this. Forget the fact pattern here for a minute. What's the proper legal framework within which to think about an equal protection claim in a context like this? What are the elements? So I think it's an intentional worst treatment of a group of prisoners or detainees, as opposed to another, without a legitimate penological reason for doing so. Okay. And is that coterminous with the free exercise analysis substantively? I don't think so, because as this court said in Reed v. Faulkner, I think that the 14th Amendment covers claims of arbitrary discrimination, and then I think the free exercise clause involves an affirmative obligation to accommodate religious practices of detainees to the extent consistent with penological aims. So I think there is more of an affirmative obligation under the free exercise clause. Yeah. I don't know. I mean, I don't know, because the First Amendment confers an individual right, right? It doesn't impose an obligation upon a state actor, and you can state the equal protection analysis in the same terms. There's an affirmative obligation upon state actors to afford equal protection under the law, right? So I don't know if it's – but it's also very difficult for me. Take this fact pattern. You cannot pray in your cell categorically because you're Hispanic. It seems to me that if that's the alleged claim, hypothetically, God forbid that would ever happen, you could state a claim under the First Amendment, free exercise, and you could state an equal protection violation. Do you agree with that? Yes. Okay. You know of any case law that would suggest to the contrary? I don't. No. Okay. Yeah. The reason I'm asking you these questions, I'm not trying to hide the ball. The equal protection case law in the context of religious practice seems very underdeveloped to me, and it's not clear to me what the best reading of Cruz versus Beto is. I mean, I agree. If you had to put a wager on it, it's probably a free exercise holding, but it may be equal protection as well. Okay. One question. Ms. Palmer, so we talked about collective prayer, but also there's evidence in the record of collective Bible studies, right? Correct. Which I think is something that's a bit distinct from prayer. And is there evidence? There seems to be evidence, is there not, in the record that the Bible studies were led? In other words, that inmates were leading the Bible studies, notwithstanding whatever stated policy they had, that inmates couldn't lead group activities? That's correct, yes. And I know that Mr. Imad stated that and his observations of that in his deposition. Other than that, is there any other evidence that the Bible studies conducted by Christians were actually led by other inmates? I believe the only evidence in the record is Mr. Imad's testimony. But I do think even without that, there's evidence that this was different than how the officers were treating group Muslim prayer, because even if it was just group prayer, that was exactly what Mr. Imad was being told he could not engage in. I guess I'm trying to address the well-established statements in case law that approve a prison and facilities non-discriminatory policy that would prohibit inmate-led group activities, right? And so here there seems to be, at least at the summary judgment stage, evidence that the prison was allowing Christians to have group collective Bible studies that were led by other inmates, and yet using that as a reason that Muslims couldn't have similar worship services. Is that an accurate reading of the record? Yes, that's an accurate reading of the record. Also, it seems like for Jamal, it wasn't clear to me whether or not it was required that someone give a sermon or a khutbah during Jamal's service. I think there was an expert that said that that wasn't necessary, and there are some statements in the appellant's brief that that was necessary. Can you clarify that for me? I'm going to double-check the record when I get back to my seat, but my understanding is that the sermon is a component, but Mr. Imad – I'll look back at the expert testimony – but Mr. Imad offered to conduct it in English and did offer to make many modifications to Juma to accord with prison security interests. I have one more question to follow up on that. Mr. Imad testified regarding the Christian Bible studies, right? Did Mr. Imad or anybody else testify that any of the individuals in this case were aware of and condoned those Bible studies, other than extrapolating from other evidence that it occurred regularly and folks were regularly in the jail? Could Mr. Imad offer any testimony that any individual defendants were personally aware of and condoned or facilitated any discriminatory conduct? Mr. Imad did not interact with Brugger and Schmidt, and so he did not have insight into their awareness. But I'll also point out that the jail was sued in 2018 over the denial of Juma, so Defendants Brugger and Defendant Schmidt had reason to be on the lookout for these issues, and that's more evidence from which a jury could infer awareness of these issues. Okay, Ms. Palmer, we'll give you your rebuttal time in a few minutes. Let's hear from Mr. Hall. Thank you. Good morning, Your Honors, and may it please the Court. As some of the questions have already indicated, we believe that this case presents a misconnection between the claims asserted and the defendants that they are asserted against. This is not a claim for injunctive relief. This is not a Monell claim. This is a claim against six individual officers attempting to hold them personally financially liable. The identities of the officers, unlike what the Court dealt with in Daniel, were well known to Mr. Imad. Throughout the briefing, we've heard about Correctional Officer Cook, Correctional Officer Baker, those who responded to various grievances. None of those individuals are named. This is purely an effort to impose supervisory liability. Can we go through the defendants? Would you mind doing that with us? Absolutely. Okay. So the three that I talked about with Ms. Palmer, Marvin, Myers, and Buckner, there seems to have been no contest in the District Court, no dispute in the District Court about their personal involvement. And it's been clarified this morning, or maybe it was and I just missed it in the briefs, that those three defendants, Marvin, Myers, and Buckner, are named only with respect to group prayer. That's our understanding, and the issue with all three of them is they're involved with programming. Okay. Where in the District Court did, I don't know if it was you or somebody else, but where did Marvin, Myers, and Buckner argue, we are not proper 1983 defendants? They did not argue it in the personal involvement section, but we went to the group prayer section. You still have to establish that the three had the requisite discriminatory intent and that they violated free exercise. The three of them were involved in efforts to request an amon. It would have been their responsibility to make those requests. They work as program specialists. So unlike the sheriff and the jail administrator and the other officer who had absolutely nothing to do with Mr. Imad, these three at least worked in the space. Okay. That's helpful, Mr. Hall, because it seems like what you're saying is, yeah, yeah, they had personal involvement. It may be that they're a proper 1983 defendant, but your perspective is the claim fails on the merits, and the District Court properly entered summary judgment for those three defendants. That's correct, Your Honor. Is that fair? That's correct, Your Honor. Okay. So turning to the issue of supervisory liability, post-Iqbal, the instructions from the Supreme Court is obviously to avoid the finding of vicarious liability, but to focus on discriminatory conduct, discriminatory intent. In Iqbal, in order to find liability, the decision-maker has to undertake an action because of, not in spite of, adverse effects upon a suspect class. In this case, all of these defendants lack that requisite level of discriminatory intent, both on the free exercise claims and on the equal protection claims. Okay. And why focus on group prayer for a second? Okay. If I want you to assume a fact, assume awareness of Christian group prayer. Okay. Is there still not intent established on that assumption? If the individual officer, if the individual supervisor is aware that there is group prayer going on with Christians and is aware that a suspect class, a subset, a different religion, is not being provided that, I think we're coming right up to the line. Like we know, to me that seems like deliberate indifference, which post-Iqbal is not supposed to be the standard. But that, I'll grant you, that might survive summary judgment. We don't have that here. Okay. Now, okay. I really appreciate your candor. Now shift to the facts. What do the facts show in your view? The facts show that there's only one place in the record where there's discussion of Christian inmates gathering in a group to potentially, and we don't even know for sure that it was a Bible, but they all had books, and so Mr. Imad assumed that they were Bibles and that they were talking. None of our individual defendants, none of my clients here, were aware of that. Mr. Imad never reported that, the issue. And so, while not directly related to this, it's still important to know, Mr. Imad had the ability to interact with fellow Muslims. He testified, in part, that he would gather with other Muslims at the lunch table, talk about sermons, talk about lessons that they've learned from those sermons. They broke Ramadan fast together and would talk about this thing, those things. And so, drawing the line between Jumu'ah, which is a very distinct thing. I would argue that's different than Bible study, right? That is something, you know, to Judge Lee's question, I think Judge Lee asked this, the khutbah, the sermon, that is part of it, Mr. Imad did seek. The concession that he was willing to make is that he would do that in English. But in his deposition, he spoke about, because of his prior experience in mosques, that he was equipped to be able to offer that sermon. He compared it, in his deposition, to what Sunday sermon would be like for Christians. So there was not an effort on Mr. Imad's part to abandon that aspect of Jumu'ah. The concession that he was willing to make is that he would do it in English. But I would say that that's still apples and oranges compared to inmates sitting around, whether they have a Bible and they're talking about the Bible. It's different than that sort of organized service. What about if you have a Bible study where the agreement is, and I know these types of Bible studies are common, where every week one person would be responsible for talking about a particular text, right? And so I think that's kind of a commonplace thing that happens in Christian Bible studies. And Mr. Imad says that that appears to be what was happening, right? That people would gather with books. One person would take the lead to start the meeting, to talk about, to give a short discussion about the particular verse at issue. So it's not that they all got gathered together and just had a group discussion. It seemed, at least if you take Mr. Imad's testimony to be true, which we need to at this point, that it was inmate-led. I think if we're drawing inferences in favor of the plaintiff and accepting all the allegations as true that are supported, I think that's right. The disconnect, though, is that Marvin Myers Buckner, and I would argue the other three as well, weren't aware of it. We need to extrapolate facts to get there, right? Yes. In order to determine whether or not these, there are no facts in the record that says they were aware of it because they sat in the room and guarded it, or they condoned it by bringing the individual Christian prisoners down to a room and let them in and passed out the Bibles. If they were aware of it, they facilitated, they condoned it. In order to get there, we need to extrapolate facts and draw inferences. That's the point I think you're making. That's the point I'm making, and it's impossible to do here because all of the evidence in the record says otherwise, right? Ruger, the jail administrator, testifies, no, that's not allowed. I wouldn't allow it. Multiple corrections officers that are opposed. Schmidt says he's unaware of it. Schmidt's saying he's unaware of it. One of the officers, I forget which one off the top of my head, said, if I saw something like that, I would intervene, I would stop, I would explain the policies, and there would be corrective action taken with the inmate. So none of my clients are aware of Mr. Imad's allegation that Christians are doing this for lack of a better term Bible study, and there's no evidence to support an inference of that. Okay, can we focus for just one second on Jeffrey Schlegel? Sure. Is he one of your clients? Jeffrey Schlegel is a program specialist, yes. Okay, and he's a name defendant here, right? He is a name defendant, but not on group prayer. Not on? For group prayer, it's Marvin Myers and Buckner. Okay, we've got to get that confirmed. You're sure? Why are you saying that? You might be right. I mean, you know the case. That's been a difficult one. There's a misconnection in this case across all of the causes of action. So Schmitt, in your view, we'll ask Ms. Palmer this in a second. In your view, Schmitt, Frueger, and Schlegel are not group prayer defendants? That's my understanding. Okay, the group prayer defendants, in your view, are Marvin Myers and Buckner. Yep. Okay. So getting back to what about the facts and the record. So at least Officer Marvin admits or concedes that Christian inmates read Bibles together in the day room. And so is what you're saying that there's no direct evidence that those Bible studies were led? Yeah, that there's an inmate-led service that's occurring with Christians. Okay, Mr. Imad, if we draw all inferences. I think people might quibble with whether or not a Bible study is a service or not a service. The question is whether or not those group activities were led. So the line you're trying to draw is that, sure, officers saw that there were a bunch of Christians together reading the Bible. But they did not realize that those group activities were being led by a particular person at a particular time. Is that the line you're trying to draw? That's consistent with the deposition testimony in the case. The record shows it's similar along the lines of the difference between prayer and worship. There's a general acknowledgment among correction staff that if there's an individual sitting at the dinner table and the individual bows their head, they may well be praying. I guess I want to focus on the Bible studies because I think Bible studies are probably more akin to services or ceremonial services, as Sheriff Schmidt talked about. And so your position is that we have officers saying that inmates got together and had Bible studies frequently. You have Imad saying that, oh, you know what? From my observation, those Bible studies were led. And so having those two facts, you're saying that an inference that the officers sometimes saw that those Bible studies were led is not a reasonable one for the purpose of summary judgment. Is that your argument? I don't think there's enough facts to get us to that inference. There's not enough facts in the record. Right, and so those two things in your mind aren't enough, that the officers saw Bible studies happening frequently and Imad saying, by the way, I saw that those Bible studies were led, that those two aren't enough to draw that inference. Well, with regard to my clients, because Mr. Imad doesn't offer his allegation specific to my clients. He offers an allegation that there's this led Bible study. In the day room? In the day room. Was Mr. Imad asking to have prayer service in the day room? His request was to have a prayer room, was to have a separate room to conduct a service. Right, the day room is different than like a chapel. If there are three men sitting around a picnic table in the day room reading the Bible, that's different than having a prayer service led by a priest or a rabbi in what would you consider to be a chapel or something like that. That's certainly correct. And Mr. Imad himself testified that he participated in such discussions in the day room. In the day room, he would have discussions with other Muslim inmates. About religion. About religion, about prophets. But he was not asking, at least the way I read, the way I understood the request in the records, he's not asking to have a prayer service in the middle of the day room where other prisoners are watching television or playing cards or, you know, having Bible study or whatever they're doing. That's not the request that he was making. Every request that he made sought a private room for this service. And from what I could tell, there's nothing in the record that suggests that any of these individuals who were sued for group prayer were aware that there was Christian prayer being led by other inmates in a separate room other than the day room, such that the denial of Mr. Imad's request was discriminatory conduct. That's correct. And Mr. Imad doesn't even allege that. It's just a failure of proof. Yes. Yes. And Mr. Imad doesn't even allege that. He doesn't allege that Christians gathered in a private room. All of Mr. Imad's allegations relate to things that he allegedly observed in the day room. Which is different than what he requested, which was denied. That's correct, Your Honor. Mr. Hall, is there any facts in the record that a defendant said that was the reason that Mr. Imad's request was denied, that it was because—and maybe I just missed it—it's because he was requesting something in a private room versus the day room? The request was denied for multiple reasons. Number one, there wasn't an imam to do it. But the other is the staffing and the supervising. But did any defendant specifically state, and another reason was that Mr. Imad requested that it be in a private room as opposed to the day room? No. I mean, the responses to these complaints, the written complaints, of which there were two, did not go into a ton of detail as to why it was denied. Through deposition testimony, we know it was because the jail was not able to secure an imam. We know that there was concern over staffing. We know that there was a general concern among jail officials as to religious events occurring in the day room. The jail administrator testified that there was risk of offending various inmates. And the sheriff went further to say that those types of incidents create security concerns for the jail, risk inmate safety. Mr. Hall, let me ask you a question about how the case was litigated. Did the plaintiff offer evidence from non-Muslim inmates about what they were able to do prayer-wise, where they were doing it, and how it was supervised or not supervised? No, they did not. And they also did not develop any sort of record related to, you know, when we turn to equal protection, turning to efforts that the jail— there's lots of criticism of jail officials for their inability to find an imam. And by the way, in Mr. Rahmad's testimony, he specifically says it would have been impossible because now that he's out of jail, he has been to the mosque in Milwaukee, and he knows that there were only two imams serving two mosques, and it was going to be impossible. They apologized to him for not being able to get there. But my point, Your Honor, is they also didn't develop any type of record as to the efforts that jail officials used to secure Christian programming in the jail. So we know that, for example, there's a group of nuns that pretty frequently come to the jail, or pretty regularly at least. There's a Jehovah's Witnesses group that comes to the jail. There is no evidence in the record at all related to the efforts that the jail made to secure those. I'll represent to the court that those are organizations that come to the jail, and not just this jail, many jails, and just proactively volunteer their services. Mr. Hall, can I ask you a question that's a totally separate subject? The individual prayer in the cell. Mr. Rahmad clearly complained about that and offered a reason we could not pray in his cell near his toilet. And from what I could see in the record, the prohibition against individual prayer in the day room using a mat or something along those lines, there's these broad generalizations of security and economic concerns. But I don't see anything more specific than that, and that seems to me to be very general. Usually when there's a security concern, the prison can articulate here is the specific concern, or an economic concern. Here is the specific. We can't afford to put a guard in a chapel to guard the chapel all day to prevent gang activity. I don't see that here with respect to not allowing Mr. Rahmad to engage in individual prayer in the day room. So my response to that would be is I believe under Turner, our obligation is to identify the basis. And we have identified the basis. I grant you I wish that there was a further developed record on it, but we did meet the Turner standard. The Turner standard is to identify the basis, and then the next step is is there a rational connection between the identified basis and the peniological interest. And here there is discussion. I mean there is discussion from the jail administrator talking about the desire to avoid offending other inmates, that if there is a worship going on, and that is distinct from prayer. The jail handbook does not restrict prayer in the day room. It restricts worship. And so if there is worshiping going on in the day room, the jail administrator is concerned that that could offend inmates of other religions. Whose testimony do you have in mind? Jail administrator Bruger, and I have a site. It is at page 60 that he discusses a desire to ensure that inmates are not offended by those rituals. The sheriff goes further to say that that could pose security risks if there is issues that arise between different inmates of different religions. And I think the other thing to point out is that this is truly worship. Salah is, it is worship. It is something different than prayer or bowing your head or meditating or anything like that. Mr. Imad himself described Salah as a physical prayer. The inmates in a prostrate position, standing, kneeling, going down to the ground, and putting all limbs on the ground. The inmates in an inherently vulnerable position throughout that process. And to guarantee the security. I'm sorry. So, you know, you raise an interesting point. Say that you are a Christian, but you belong to a sect where for certain prayers you need to kneel. Okay. Would that qualify as worship in the definition that Schmidt would use it, or would that be prayer? We would have to ask the sheriff. My sense is the sheriff defined it as he drew that distinction between prayer and worship. In his mind, and it's always couched in, he was going to defer to, you know, the jail administrators, the folks who are in the jail. But in his mind, he was looking at, is there loud outbursts? Is there an involvement of something else? So in this case, you have a prayer towel that's used or a prayer rug. At that point, it moves into worship as opposed to prayer. The jail did not allow the lighting of a menorah camp because of concerns over safety with fires and things like that. And so when you're going into, when you're moving beyond somebody who's, you know, sitting at the dinner table and may bow their head for a couple of minutes, and there's no real way for an officer to know what they're doing or not doing. As you start to move into, okay, this person's on their knees, you know, making the sign of the cross or whatever. Now you know, okay, we're going into worship at some point. You know, where exactly that line is drawn, you know, I think probably depends on the circumstances. But here with Salah, it's very clear. Was there any inquiry made by Sheriff Schmidt to determine whether or not Muslims, there was a way that Muslims can pray that would not involve a prayer rug and being prostrated on the ground? This issue was never brought to the sheriff. So that's part of the problem. The sheriff and the jail administrator had no contact with Mr. Imad. He didn't even know who they were. I guess what struck me about Sheriff Schmidt's testimony was that his view of prayer seemed like a very kind of Western Protestant definition of prayer. What would be allowed is prayer, right? And I'm curious as to, and that's how he defined it, and I'm curious as to whether he did any investigations about whether or not just bowing your head and speaking silently to yourself would be sufficient for prayer for any other context, say for Catholics or Muslims or anyone else. I just want to drill this point home. The jail handbook does not bar prayer in the day room. It bars personal worship. And that is the distinction. Well, again, but you're defining prayer in terms of a Western Protestant kind of view, definition of prayer. And I was wondering whether there was any inquiry to decide whether or not Muslims could pray without doing the various things that they do. Respectfully, I don't think that definition of prayer is solely limited to Westerns and Protestants. The quiet prayer or bowing your head or meditating, those aren't unique to Christianity and they're not unique to Western culture. It's something in the Buddhist religion. And there's 4,000 religions in the world. Westerns and Protestants are not the only ones who bow their head and engage in quiet prayer. In terms of further investigation or questioning on Mr. Ahmad, if his prayer, if his salah required going prostrate, no. The sheriff was not aware of anything related to Mr. Ahmad. The jail administrator was not. It's for that reason that they were properly dismissed from the case. Mr. Hall, can I ask you one further question? I'll ask Ms. Polman the same question regarding qualified immunity. I suspect that the jail, the guards in the day room had to distinguish between worship and prayer. And what I mean by that is, let's say you had a Catholic prisoner that was going to say the rosary every day. So he went in the day room, he had his rosary beads, he bowed his head and said the rosary. Now you have another Catholic prisoner who says, no, no, I'm going to say the rosary every day. But I have to do it on my knees facing a crucifix and I have to say the rosary out loud every day. That's what I'm going to do. The jail, I assume the guards then have the discretion to say, wait a minute, you can say the rosary silently with your head bowed, no problem. We consider that to be prayer. You can't get on your knees with your back turned to the rest of the population, face the crucifix, say the rosary out loud. That could create security problems with the prisoners. Are there any cases in terms of the qualified immunity context that say you can't distinguish between prayer and worship in that way that you're aware of? None that I have found. Okay, Mr. Hull, thank you very much. Mr. Palmer, we're going to give you at least five minutes. There's quite a bit to sort through here. Would you mind starting with which defendants, which named defendants are named on which claims? Yes. So as to equal protection and group prayer, it's everyone. So that's a simple, simple distinction. Okay. Now, is Mr. Hull just mistaken in your view on the group prayer that it's only Marvin Myers and Buckner? Yes. The group prayer claim is as to all defendants. Okay. We talked at length about how Defendant Schmidt and Bruger were aware of the discriminatory enforcement of the policy. That makes them liable for the free exercise claim based on the group prayer claim. Okay. Group prayer, free exercise, and equal protection, every single defendant? Yes. Okay. All six? Yes. Okay. Individual prayer, just the two? Correct. Okay. Now, can you go to my question? Sure, of course. Are you aware of any cases that say that prison officials cannot distinguish between worship and prayer? And granted, this gives the individual jail guard discretion to say you can bow your head and say the rosary. You can't kneel in front of a crucifix and say the rosary out loud. But are there any cases that say you can't do that under the free exercise clause? Yes, Your Honor. And I don't have a case appointed with the exact one-to-one fact matching that I think you're asking about. But I'll explain why qualified immunity is inappropriate in this case. I'd first like to say that the context here is a considered jail policy in the free exercise context. This is not the fast-moving Fourth Amendment context where the Supreme Court has said that one-to-one fact matching is particularly important because of the imprecise nature of the legal standards. And in the free exercise context, we have cited cases at the right level of specificity. So the first, again, there are two constitutional principles clearly established that defendants violated with this policy. The first one is that it is clearly established that a jail cannot inhibit the right to pray without some justification. And on the basis of that clearly established law, this court has easily denied qualified immunity in cases where defendants failed to come forward with a justification for a policy. That's Williams v. Lane and then more recently in Garner v. Munchau. And in both of those cases, this court denied qualified immunity and it said what the clearly established law is at the exact level of specificity that we asked this court to apply today and denied qualified immunity without a exact fact matching. And that makes good sense because the principle that you can't inhibit religious exercise without some justification is very straightforward and easy to apply. The second clearly established principle is that a jail cannot have a regulation that inhibits religious exercise that it enforces against members of some religious groups but not another. That's Grace v. Shuler. And both of those cases amply put defendants on notice that their conduct was unconstitutional in this case. I'd like to respond to a couple points that defendants raised. First, Judge Kirsch, you were right to note that defendants do not articulate a credible basis for the restriction on personal prayer in the day room. And defendants counsel, I think this court has been very clear that in Neely Bay to Riegel that mere incantation of a penological interest is not sufficient under Turner. You have to explain it and you have to have record evidence to support it. And there isn't any in this case. The sole citation to the record in defendant's brief is a single comment from defendant Schmidt's testimony. Much of the rest of the record contradicts that comment. And it is that more involved prayer could, quote, cause difficulties for other detainees. That's all. It is not elaborated and it is contradicted by much of the rest of the record. Ms. Palmer, can I ask you a factual question about the plaintiff's perspective on praying in his cell? My understanding is that his objection was praying within a room with a nearby toilet and that he just wanted to engage in the personal prayer, five different increments during the day, in some other location. Correct. Whether that's here or there or the day room or the library or the lounge or wherever, it doesn't matter. His point was that I can't adhere to the tenant requiring me to pray five times a day in this location. I just need to be in some other location, not near a toilet. That's right. Was he ever specific as to what location he wanted? No, Your Honor. Not as to individual prayer nor as to Juma. I did want to correct that point as well. In his three written requests about Juma, he said that he wanted space to perform Juma. He didn't say private room. He said space. And that could have been the library, the rec room, the day room, or programs supervised by a program specialist. But the day room, it sounds like the day room was out because there was a policy in the jail that prohibited worship in the day room. And that clearly would have been worship, right? It would have been different than prayer. In other words, there's this policy that the jail has that says you can pray in the day room but you can't worship in the day room. And unless we find that that policy is unconstitutional and the defendants are not entitled to qualified immunity regarding that policy, then that becomes a problem if he's not requesting a separate room for the group prayer. Does that make sense? If the policy were neutrally enforced and there was a... There's no evidence that it wasn't. What you're saying maybe clarifies things, but your client was requesting space. So that means the jail needs to interpret that. I took it as your client was requesting a separate room for the prayer. But if you're saying that's not what he was requesting, then I think that actually helps the defendants. Because if the defendants interpreted it as he was requesting group prayer, group-led prayer in the day room, they would say, oh, no, no, no, no. We never allow that under the worship policy. And that's the end of the case. But maybe I'm wrong on that. I think he has to be requesting a separate room. I think if he's requesting group worship in the day room, it makes it a much easier case for the defendant. He was requesting group worship anywhere. And defendants could have viewed that as a request for group worship in the library or a programs classroom. And then that wouldn't have been a clear-cut case for them under the policy. Ms. Palmer, I found the expert statement. It's the Ingram Declaration at paragraph 7, where he says, Jumu'ah customarily consists of performing the salat prayer followed by a sermon known as a khutbah. When there is no imam available to give the sermon, that part can be skipped. It is a gathering of Muslims to pray together at or after noon on Fridays. It constitutes Jumu'ah as such. How are we supposed to weigh that compared to the actual request that Mr. Imad made, that he wanted to have a Jumu'ah with a sermon? Well, Mr. Imad said that in his deposition. When he was asking for Jumu'ah, he was asking for Jumu'ah. He was not saying specifically there is a sermon component. He said there doesn't need to be an imam. And he indicated that he was willing to modify it in a way to be consistent with the jail's security concerns. What he said in his final grievance appeal was, all we need is for two or more people to pray together peacefully. So I think that's the request that was presented to the jail. And so we can take account of the expert's testimony. I would just like to end by saying, again, that prayer is special. It is core to the protections of the free exercise clause and embedded in our constitutional tradition. And defendants denied Mr. Imad the ability to pray. And we ask this court to vacate the district court's decision. Okay, very well. Ms. Palmer, thanks to you. Mr. Hall, thanks to you especially for bearing with a long argument. There's a lot in play here. We appreciate it very much.